J-A01014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| BRETT YOUNG, | |
| Appellant | No. 163 EDA 2015 |

Appeal from the Judgment of Sentence September 8, 2014
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0002095-2013

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED MARCH 01, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Bucks County by the Honorable Albert J. Cepparulo on September 8, 2014, following Appellant's convictions of two counts of Possession of a Controlled Substance with Intent to Manufacture or Deliver (PWID) and five counts of Use or Possession of Drug Paraphernaila.[1]  On appeal, Appellant contends the trial court erred in denying his motion to suppress items seized from his home following a traffic stop.  Following a careful review of the record, we affirm.

---

[1] 35 Pa.C.S. §§780-113(a)(30), (a)(32), respectively.

*Former Justice specially assigned to Superior Court.

At the hearing held on Appellant's pretrial motions, Officer Gregory Smith, an eleven-year veteran of the Bensalem Township Police Department specially trained in narcotics investigations, testified that in November of 2012 he was contacted by a reliable confidential informant (C.I.) who informed him Appellant was a large-scale marijuana dealer in the area from whom he or she had previously purchased marijuana. N.T., 8/21/13, at 26-27. The C.I. relayed that Appellant lives near a bar and drives a black pickup truck. *Id*. at 27. With a description of Appellant's vehicle and home, Officer Smith obtained Appellant's name and address and discovered he drove a black, Lincoln pickup truck. *Id*. at 27-29.

On November 26, 2012, Officer Smith set up a controlled buy between Appellant and the C.I. *Id*. at 30. Officer Smith maintained constant surveillance of the C.I., and Sergeant Robert Bugsch and Officer Joseph Gansky, also of the Bensalem Township Police Department, maintained a constant visual surveillance of Appellant's residence at 5445 Flushing Road, Bensalem Township, throughout the transaction.[2] *Id*. at 31. Ultimately, the C.I. purchased what was later determined to be one pound of raw marijuana packaged in gallon-sized, plastic vacuum bags. *Id*. at 37-41.

---

[2] Both Sergeant Bugsch and Officer Gansky had been employed in the field of law enforcement for a number of years and received narcotics training on the federal, state and local levels. Between them, they had been involved in over fifteen hundred (1,500) narcotics investigations. N.T., 8/22/13, at 183; N.T., 8/23/13, at 462.

Officer Smith thereafter prepared an application for and obtained a GPS Tracker Order for Appellant's vehicle which allowed police to monitor his movements in that when he left the small street on which his home was located, the aforementioned officers would receive an alert on their cell phones. N.T., 8/21/13, at 41-42, 43-44, 128-29; N.T., 8/22/13, at 197-98; N.T., 8/23/13, at 469-70.

On December 3, 2012, Officer Smith received an alert that Appellant's truck had left his residence and was traveling southbound on Roosevelt Boulevard into Philadelphia. N.T., 8/21/13, at 44-45. He communicated with surveilling officers who located Appellant's vehicle in the Hop Angel bar parking lot. N.T., 8/23/13, at 494-95. Approximately twenty minutes after officers arrived, Appellant left the bar and proceeded to a gas station and then onto I-76 toward Center City at which time officers lost sight of the truck. N.T., 8/22/13, at 204-05, 208, 245; N.T., 8/23/13, at 497, 499. Officer Smith who had been monitoring the truck's GPS movements at the police department soon after informed Sergeant Christie and Officer Gansky the vehicle had stopped in the area of 30th Street and Cambridge Street in Philadelphia, and Sergeant Christie and Officer Gansky responded to this location. N.T, 8/21/13, at 48-49; N.T., 8/22/13, at 208. Officer Smith believed that the number of short, quick stops Appellant was making along the way indicated he was delivering marijuana at different locations. *Id*. at 56-58.

Conducting surveillance of Appellant's truck on foot, the officers observed Appellant and an unknown individual exit the residence and walk over to the vehicle where Appellant retrieved what appeared to be a heavy hockey-style bag. The bag's weight was suggested by the fact that Appellant struggled to heave it onto his shoulder. N.T., 8/21/13, at 53; 8/22/13, at 209, 211, 216, 246-47; N.T., 8/23/13, at 500-01, 505. Appellant returned with his companion to the residence where they remained for ten to twenty minutes after which they exited with Appellant carrying the same, still apparently heavy bag which he placed in the bed of his truck. N.T., 8/22/13, at 215, 218; N.T., 8/23/13, at 502, 507. Officer Gansky noticed plastic material hanging out of the top of the then-opened bag. N.T., 8/22/13, 215-26, 247. After a brief conversation, Appellant left the area, and the individual reentered the home. N.T., 8/22/13, at 217-18. The man was later identified as Jason Mellor.

Appellant proceeded onto northbound I-95 toward Bensalem. N.T., 8/22/13, at 222. Officer Smith contacted a K-9 officer, Officer Brian Cowden of the Bensalem Township Police Department, to initiate a stop of Appellant's vehicle when he exited I-95 and conduct a subsequent search of the vehicle for drugs. N.T., 8/21/13, at 57-58. Officer Smith informed Officer Cowden of the controlled buy involving the C.I. and Appellant that occurred a week earlier and provided him continuous updated information regarding Appellant's stops and their location in Philadelphia. N.T., 8/22/13, 222-23,

324, 339-40. In addition, Officers Smith and Gansky both testified that he informed Officer Cowden of Appellant's behavior earlier that evening, and specifically, that he believed he was heading home to Bensalem with a large bag in the back of his vehicle which, in light of his training and experience, he believed contained marijuana. N.T., 8/21/13, at 59; N.T., 8/22/13, at 223.

The trial court detailed what happened next as follows:

Officer Cowden had been a K9 officer at Bensalem Township Police Department for nine (9) years. N.T. 8/22/13, 287. During this time, he had become a certified K-9 handler and he had handled two (2) different canine officers. Id. at 288-89, 290 -91. The K9 related to this case is "Edo." Id. at 290. Edo is cross-trained to locate both subjects and the tracking and recovery of evidence, building searches, and narcotics detection. Id. at 292-296. Edo is trained to detect marijuana, crack cocaine, powder cocaine, heroin, and methamphetamine.[10] Id. at 296.

On December 3, 2012, Officer Cowden observed a 2007 black Lincoln pick-up truck at approximately 10:45 p.m. and followed the vehicle off Street Road and onto the Route 13 (Bristol Pike) exit. N.T. 8/21/13, 105; N.T. 8/22/13, 325. He followed the vehicle northbound on Bristol Pike in the area of Park Avenue and effectuated a traffic stop. N.T. 8/22/13, 325. Officer Cowden noticed the truck had dark-tinted windows on the front wing windows, which is prohibited in Pennsylvania. Id.[3] He

---

[3] Section 4524 of the Motor Vehicle Code provides in relevant part:

**§ 4524 Windshield Obstructions and wipers**

&ast;&ast;&ast;

**(e) Sun screening and other materials prohibited.-**

 (1) No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle

*(Footnote Continued Next Page)*

testified that this is the reason he pulled [Appellant] over "in cooperation with also it being a narcotics investigation." Id. at 325, 416-17. However, he later candidly testified that he would have pulled the vehicle over regardless of the dark–tinted windows because he was given orders to do so. Id. at 358 -59.

During the stop, Officer Cowden first made contact with [Appellant] and asked for his driver's license, insurance, and registration.[11] N.T. 8/22/13, 329, 402. During this stop, [Appellant]'s hand was visibly shaking and he "wouldn't make eye contact" with Officer Cowden. Id. at 327, 360. Officer Cowden told him he was pulled over for his window tint, to which [Appellant] responded he planned on having it removed immediately. N.T. 8/22/13, 358. Officer Cowden took the documents from [Appellant] and ran information back in the patrol car. Id. at 360. He then re-approached [Appellant]  and inquired as to where he was coming from and where he was going. N.T. 8/22/13, 338. [Appellant] indicated he came from La Scala restaurant in Philadelphia and was going home. N.T. 8/22/13, 339. Officer Cowden asked [Appellant] to step out of the vehicle and asked if he could pat him down and [Appellant] indicated he could. Id. at 362-63, 404 -06. At this point he told [Appellant] to calm down and relax because he "appeared nervous." Id. at 364. Officer Cowden, while he had [Appellant]'s documentation in his hands, continued to question [Appellant] behind [Appellant]'s vehicle, and asked if he had ever been arrested before, exactly where he was in Philadelphia, where he lived and for how long, along with other questions. Id. at 364 -65, 367-69, 406-07, 413-15, 425-26. Officer Cowden admitted that none of these questions related to the window tint issue. Id. at 366-67, 424, 425-26. Officer Thomas Mee (also of the Bensalem Township Police Department), who responded to the scene, also asked [Appellant] unrelated questions as well that were not related to the window tint. Id. at 425.

Officer Cowden then instructed [Appellant] to get back into his vehicle and he complied.  Id. at 432.  Officer Cowden went back to his patrol vehicle to continue this "investigation" and

_(Footnote Continued)_ _____

> so their windshield, side wing or side window of the vehicle.

75 Pa.C.S.A. § 4524(e)(1).

instead contacted Officers Smith and Gansky and they indicated that he should go the "consent route" meaning asking the driver if he would consent to a search of his vehicle. N.T. 8/22/13, 340 -41, 369 -70, 372-74.

Officer Cowden re-approached [Appellant] and had him exit the vehicle a second time. N.T. 8/22/13, 376, 433. He brought [Appellant] to the back of his vehicle and informed him that he was getting a verbal warning for tinted windows, gave him his documentation back, shook his hand and told him he was free to go. Id. at 376-77, 393-94, 433-34. [Appellant] got back into his vehicle. Id. at 376-77, 394-95.

However, shortly thereafter Officer Cowden went back to the vehicle and asked [Appellant] for the third time to exit the vehicle and for consent to search his truck. Id. at 378, 395. [Appellant] exited but replied "No. Do you have a search warrant?" N.T. 8/22/13, 342, 378. Officer Cowden responded "No." Id. [Appellant] then turned to go back to his vehicle and Officer Cowden immediately commanded [Appellant] to stand towards the back of the vehicle for a third time with Officer Mee.[12] Id. at 343, 379, 396 -98, 434. [Appellant] complied and Officer Cowden then deployed Edo. Id. at 343-44, 379. Edo indicated the presence of narcotics at the driver's side of the back bumper, in that he started sniffing intently and began to scratch at this side of the rear bumper. Id. at 348-49.

[Appellant] was taken into custody and told the officers were going to apply for a search warrant for his vehicle. N.T., 8/22/13, 349-50, 380. Before any search warrant arrived, during a search incident to arrest, Officer Cowden removed about $450 from [Appellant]'s person, as well as his ID and cell phone. Id. at 349-50, 383. Furthermore, Officer Cowden described [Appellant] as "cool as a cucumber" in a text to Officer Gansky; he later explained that he observed indicators that [Appellant] appeared nervous. Id. 331-35. He testified that the following factors indicate an individual is nervous: perspiration, carotid artery in the neck pulsing vigorously, short breaths/not being able to catch one[']s breath, and folded arms. Id. In [Appellant], Officer Cowden only noticed that he crossed his arms very briefly, did not make eye contact and his hand was shaking when he initially turned documents over to the officer. Id. at 327, 334-35,421-22, 443.

Officer Gansky was situated across the street during the stop and thereafter he conducted an inventory search of [Appellant]'s vehicle, which was not recorded because Officer Cowden had turned off the overhead lights of his vehicle which

activated the video recording. Id. at 226, 228, 250-51, 387-89, 392. Officer Gansky filled out the general inventory form which documents any valuables inside the vehicle as well as the present condition of the vehicle. Id. at 228-29. However, at the time of the hearing Officer Gansky did not have the form nor was it given to the District Attorney in discovery because it was not logged with the rest of the evidence and Officer Gansky believes it was in a paperwork filing cabinet. Id. 229-30. Furthermore, he testified he did not get permission to perform an inventory search of the vehicle from a sergeant because he did not need to. Id. at 260-61. However, the BTPD inventory policy, which was in effect May 27, 2011, indicates that the officer directing the vehicle to be towed/seized "will inspect and inventory the vehicle unless responsibility has been transferred to someone upon approval of an off-duty supervisor." N.T. 8/22/13, 260-61; See Exh. DS-1. Further, the policy provides that "the search must be conducted in good faith and not as a substitute for warrantless investigatory search for gathering incriminating evidence or contraband." N.T. 8/22/13, 258-59, 262-63; See Exh. DS-1. Finally, the inventory policy provides that on every inventory, a Vehicle Inventory Form is required to be filled out, containing a detailed description of the items discovered and a detailed description of where the item was located in the motor vehicle, among other things. N.T. 8/21/13, 152; N.T. 8/22/13, 386; See Exh. DS-1. Officer Gansky stated he did not smell anything when he opened up the bed of [Appellant]'s truck. N.T. 8/22/13, 281-82. A duty tow was called, and following the inventory, Officer Cowden escorted the duty tow back to the Bensalem Township Police Department sally port. Id. at 351-52.

Following an inventory of [Appellant]'s truck, Officer Gansky, along with Sergeant Christie and BTPD Officer David Clee, Jr. (who is assigned through Bensalem to the Drug Enforcement Agency),[13] made contact with one of the occupant owners of 918 North 30th Street, Jason Mellor. N.T. 8/22/13, 230-32. Mr. Mellor was identified as the subject that was with [Appellant] earlier that night. Id. at 231. He advised that he had purchased seven (7) pounds of marijuana from [Appellant] for $21,000. Id. at 232.

Meanwhile, Corporal Brady and Officer Smith together authored a search warrant for [Appellant]'s vehicle. N.T. 8/21/13, 64. Included in this search warrant is the following information: the C.I.'s initial information, the controlled buy conducted on November 26, 2012, observations during the

Philadelphia surveillance, and the specifics regarding the traffic stop and subsequent K9 search of [Appellant]'s vehicle. See Exh. CS-2. The search warrant was approved by a magisterial district judge and was thereafter executed. N.T. 8/21/13, 67; See Exh. CS -2.

The evidence seized from the search of the truck was utilized in the Search Warrant for [Appellant]'s Residence. N.T. 8/21/13, 78-79; See Exh. CS-4. This search warrant was approved by magisterial district judge Gary Gambardella and the signed warrant was sent back to the BTPD headquarters at approximately 4:00 a.m. on December 4, 2012. N.T. 8/21/13, 81; See Exh. CS-4. In the search warrant, the following facts were sworn to: the initial information provided by the C.I., the November 26, 2012 controlled buy, the December 3, 2012 physical surveillance of Mr. Young in Philadelphia, the stop of [Appellant's] vehicle in Bansalem, items seized from this stop, and information received following a knock and talk with Jason Mellor. Id. However, on the face sheet of the search warrant in the area designated for "Date(s) of Violation," in error 12 /16/12 was placed. N.T. 8/21/13, 97-99, 163-64, 165; See Exh. C -4. Officer Smith explained that this was a typo because [Appellant]'s date of birth is December 16Th. N.T. 8/21/13, 163 - 66.

Corporal Adam Kolman (of the BTPD) and Officer Cowden were sent to secure [Appellant]'s residence at approximately 1:30 a.m. on December 4, 2012, as [Appellant]'s house backs up to the Neshaminy Creek and it would be difficult or impossible to safely secure the residence and also out of fear that any other evidence would be destroyed. N.T. 8/21/13, 88-90; N.T. 8/22/13, 353, 355; N.T. 8/23/13, 515, 530 -31. [Appellant] lives on a small block of four to five homes. N.T. 8/23/13, 516. The officers were provided with a key to [Appellant's] residence recovered from [Appellant] by members of the special investigation unit. N.T. 8/21/13, 91-93; N.T. 8/23/13, 515, 520, 530 -31. They were instructed to make outside observations first and to report back to Officer Smith as to their observations. N.T. 8/23/13, 515. During this time, [Appellant] was in custody. N.T. 8/21/13, 89; N.T. 8/23/13, 532. Additionally, the officers were informed by members of the special investigations unit that there would be a large dog in the residence. N.T. 8/23/13, 519 - 20.

Once officers arrived, they noticed a work pickup truck parked in front of [Appellant]'s residence and other cars parked in the cul-de-sac next to his residence. Id. at 516, 531-32.

Neither officer was aware of what vehicles belonged to what home, as this was a common parking lot. Id. at 517. There was some interior lighting on the first floor of the residence. Id. at 516, 518, 532.

Officer Cowden testified that he believed the two knocked on the door and announced their presence prior to entrance. N.T. 8/22/13, 354, 446, 448. Corporal Kolman testified to the same, and stated it was his common practice to announce his presence before entering a residence. N.T. 8/23/13, 521, 533. Thereafter, they waited to go into the residence for ten (10) to twenty (20) seconds. N.T. 8/22/13, 449. The officers were not sure if anyone else would be in the residence. N.T. 8/23/13, 538. Upon entry, they observed the dog secured in a crate. N.T. 8/22/13, 449-50; N.T. 8/23/13, 522. They cleared the entire residence and announced their presence on every level of the home. N.T. 8/23/13, 522-23, 535-36. In an upstairs bathroom, they observed a rifle. N.T. 8/23/13, 522. In the basement, they observed a four-foot-by-five–foot safe with a bulletproof vest next to it and an unopened box that contained eight by ten inch freezer bags. N.T. 8/23/13, 522-23. Thereafter, they remained on the first (main) floor of the residence until the search warrant was obtained. N.T. 8/23/13, 525. They were on scene for approximately three (3) hours and during this time no one tried to gain entrance to the residence. N.T. 8/23/13, 525. Neither officer searched through other items and did not do anything other than clear the residence. N.T. 8/23/13, 526. The search warrant was thereafter executed on the home at approximately 4:20 a.m. on December 4, 2012. N.T. 8/21/13, 95.

Based on both the complexity and number of issues presented, we took the matter under advisement and it was determined that both the District Attorney and defense would submit letter briefs. N.T. 8/23/13, 560-61. We ordered that the defense was to submit a brief within twenty (20) days, and the District Attorney was given ten (10) days thereafter to respond. Id. at 561.

The defense submitted a brief on or about Thursday, September 12, 2013. The Commonwealth submitted a brief on or about September 23, 2013.

Based upon the comprehensive testimony received, the legal briefs submitted by both parties, and this court's exhaustive review of all applicable appellate law, we issued an Order on January 6, 2014 outlining our conclusions of law, with the intention of apprising the parties on the record of our findings of fact prior to [Appellant]'s trial. We compartmentalized

the volume of issues into three (3) categories and Ordered that the motion to suppress all physical evidence seized from Defendant's vehicle was granted and all evidence seized was suppressed, the motion to suppress physical evidence seized during the initial entry into Defendant's residence was denied, and the motion to suppress all physical evidence seized pursuant to a search warrant issued for Defendant's residence was denied.

_____

[10] [Appellant] initially challenged Edo's qualifications to conduct the dog sniff of the exterior of [Appellant's] vehicle during the stop. See "Omnibus Pretrial Motion," 6/11/13, ¶¶ 27-28. However, based on comprehensive testimony of both Officer Cowden (Edo's handler) and his independent trainer Robert Swann, we determined that, without question, Edo is qualified. See N.T. 8/22/13, 175-182, 290-321; N.T. 8/23/13, 546-53; See Exh. CS-8; CS-10. However, because [Appellant] does not challenge this determination on appeal, we see no need to set forth a detailed account of the facts supporting our reasoning.

[11] The entire stop was captured by the audio and visual recording devices in Officer Cowden's patrol vehicle. N.T. 8/22/13, 356-57. The recitation of the facts regarding the stop below is based upon the evidence submitted at the suppression hearing in the form of witness testimony as well as our independent review of this recording, which was entered into evidence as CS-9.

[12] Specifically, Officer Cowden stated "step back over there with him" four separate times in an increasingly louder voice. N.T. 8/22/13, 399, 437-38.

[13] See N.T. 8/21/13, 109.

Trial Court Opinion, filed March 12, 2015, at 9-16.

Following a stipulated waiver trial held on September 8, 2014, the trial court found Appellant guilty of the aforementioned crimes. On that same date, Appellant was sentenced to twenty-four (24) months to sixty (60) months in prison on the PWID conviction. Finding him to be RRRI eligible, the sentencing court reduced his minimum sentence to eighteen (18) months. Appellant was further sentenced to a one (1) year period of

probation on the five Possession of Drug Paraphernalia convictions which were to be served consecutively to Count 2 and to each other. Appellant filed his Motion for Reconsideration of Sentence on September 17, 2014, and the same was denied following a hearing on December 15, 2014.

Appellant filed a notice of appeal with this Court on January 13, 2015, and his Statement of Matters Complained of on Appeal on February 3, 2015, wherein he raised the same five issues he presents in his appellate brief for our review:

> A. Whether the Trial Judge correctly decided that there was probable cause for the stop of [Appellant's] vehicle.
>
> B. Whether the Trial Judge correctly decided that there was probable cause to seize and arrest [Appellant] during the traffic stop which led to the seizure of the key to the searched home and created a delay during which time the police obtained information for use in the search warrant of the home.
>
> C. Whether the Trial Judge correctly decided that the police had probable cause and exigent circumstances for a warrantless entry of [Appellant's] residence under both the 4th Amendment and Pennsylvania Constitution when no one was home and [Appellant] was in custody which would have required suppression of the evidence found therein.
>
> D. Whether the Trial Judge correctly decided that there was probable cause for the authorization of a night time search warrant after excluding information from the search warrant as a result of suppression.
>
> E. Whether the night time search warrant for the home was supported by probable cause for a night time execution if the evidence observed by police during the warrantless entry was omitted.

Brief for Appellant at 3-4.

In addressing these claims, we are mindful of our well-settled standard of review:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en banc*) (citations, quotations, and quotation marks omitted).

Initially, Appellant asserts the trial court incorrectly decided officers had probable cause to stop his vehicle. We note this Court has held that there are three categories of interactions between police officers and citizens.

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Fleet*, 114 A.3d 840, 845 (Pa.Super. 2015) (quotation omitted).

75 Pa.C.S.A. § 6308(b) permits a police officer to conduct a vehicle stop if he has reasonable suspicion to believe that a violation of the Motor

- 13 -

Vehicle Code is occurring or has occurred; thus, where a Vehicle Code violation is suspected, but a traffic stop is necessary to further investigate whether a violation has occurred, an officer need only possess reasonable suspicion to make the stop. **Commonwealth v. Salter**, 121 A.3d 987, 993 (Pa.Super. 2015); **see also Commonwealth v. Holmes**, 14 A.3d 89 (Pa. 2011) (determining the standard of reasonable suspicion was sufficient to stop a vehicle to investigate a front windshield obstruction).

To meet the less stringent standard of reasonable suspicion, the officer must point to specific and articulable facts which, together with the rational inferences drawn therefrom, reasonably warrant the intrusion. **Commonwealth v. Smith**, 904 A.2d 30, 35 (Pa.Super. 2006). Thus, to establish reasonable suspicion, a police officer must be able to identify specifically facts which led him to reasonably suspect a violation of the Vehicle Code, in this case Section 4524(e).

The courts also have plainly held that officer safety concerns are heightened during traffic stops. The United States Supreme Court recently emphasized that "[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." **Rodriguez v. United States**, 135 S.Ct. 1609, 1616 (2015) (internal quotation marks and citations omitted). Safety concerns are even greater when the motor vehicle stop occurs at night. **See In re OJ**, 958 A.2d 561, 566 (Pa.Super. 2008) (noting

- 14 -

that nighttime "creates a heightened danger that an officer will not be able to view a suspect reaching for a weapon."). In light of such valid safety concerns, police officers who conduct a traffic stop are entitled to require that the driver and any passengers step out of a vehicle "as a matter of course." *Commonwealth v. Campbell*, 862 A.2d 659, 663 (Pa.Super. 2004). Such minimal intrusions on the privacy rights of drivers and passengers are permissible "because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *California v. Carney*, 471 U.S. 386, 391 (1985).

Furthermore,

> [w]hile it is argued the lesser standard will allow a vehicle stop to be made based on pretextual motives, the United States Supreme Court made clear that case law "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *[Commonwealth v. ]Whren,* [517 U.S. 806] at 813, 116 S.Ct. 1769 [(1996)]. **In other words, if police can articulate a reasonable suspicion of a Vehicle Code violation, a constitutional inquiry into the officer's motive for stopping the vehicle is unnecessary**.

*Commonwealth v. Chase*, 960 A.2d 108, 120 (Pa. 2008) (emphasis added).

Our review of the record contradicts Appellant's assertion the initial traffic stop was illegal, for while the trial court maintained the police officers had probable cause to stop him for a violation of the Vehicle Code, in light of the foregoing authority, they needed only reasonable suspicion. Officer Cowden testified Appellant's vehicle had dark tinted windows on the front

wing window which is prohibited in Pennsylvania, even though he also candidly admitted he would have pulled him over for a narcotics investigation notwithstanding. N.T., 8/22/13, at 325-26. In addition, both Sergeant Christie and Officer Gansky indicated that while surveilling Appellant prior to the stop, they did not have a clear view of the vehicle's interior due to the tint. *Id*. at 207, N.T., 8/23/13, at 495. Furthermore, Appellant himself admitted to Officer Cowden he was planning to have the tint removed as he had difficulty seeing out of the vehicle. N.T., 8/22/13, at 327, 376. As such, under the totality of the circumstances, the officers' initial observation of Appellant's dark tinted windows gave them reasonable suspicion to believe Appellant was in violation of 74 Pa.C.S.A. § 4524(e)(1); therefore, the subsequent traffic stop to investigate further the window tint was supported by reasonable suspicion. *See* 75 Pa.C.S.A. § 6308(b); ***Commonwealth v. Feczko***, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*), *appeal denied*, 25 A.3d 327 (Pa. 2011).

Regardless, the trial court suppressed all evidence seized from Appellant's vehicle and his post-arrest statement upon finding that the purpose of the stop was effected prior to the officers' detention of Appellant and deployment of the K-9; thus, the trial court analyzed the validity of the search warrant issued for Appellant's residence without considering such evidence.

Nevertheless, Appellant next contends that but for their pretextual stop of Appellant's vehicle, officers would not have discovered marijuana in his vehicle, which fact they used "to confront the individual in Philadelphia which led to information for the search warrant and [ ] would not have had his key to enter his home while he was in custody without a warrant." Brief for Appellant at 21-22. Appellant reasons that if the traffic stop had ended prior to the K-9 search, he would have returned home with the knowledge that officers were surveilling him and could have removed any contraband therefrom and from his vehicle before they discovered it; thus, none of the evidence uncovered following the search of his residence would have been available to use against him at trial. Specifically, Appellant indicates that as the search warrant was authorized approximately three hours after Officer Cowden and Corporal Kolman arrived at Appellant's residence, he would have had a minimum four hours to remove the contraband from his vehicle and his home. Brief for Appellant at 23-24.

Initially, we note that while our review of the record reveals Appellant challenged the propriety of the traffic stop below, he did not set forth in either his suppression motion or at trial the specific argument he makes herein that but for the traffic stop, officers would not have been able to seize evidence from his home pursuant to a search warrant because he would have had an opportunity to destroy it. Having failed to raise this specific issue before the trial court, Appellant has waived it for appellate review.

Pa.R.A.P. 302(a)(issues not raised in the trial court are waived on appeal); **_Commonwealth v. Muniz_**, 5 A.3d 345, 352 (Pa.Super. 2010) (this Court will not consider an issue an appellant fails to raise before the suppression court).

Even had he properly preserved this tenuous issue for appellate review, Appellant's speculative analysis ignores the fact that in light of its determination Appellant had been illegally seized once the purpose of the traffic stop concluded, the trial court suppressed all evidence recovered from Appellant's truck as well as his post-arrest statement. In addition, the trial court properly applied the exclusionary rule when analyzing the validity of the search warrant issued for his residence in that it carefully and distinctly considered the items seized as a result of the traffic stop, the officers' plain view observations upon their initial entry into Appellant's home, and their search of his home pursuant to a warrant.

In doing so, the trial court noted Appellant erroneously presupposed that the officer's seizure of the key to his residence was a prerequisite for the approval of a search warrant for the premises, for the probable cause affidavit does not include any information that Corporal Kolman or Officer Cowden either possessed a key to Appellant's home or intended to use it to gain entry thereto. The trial court further found that Appellant's detention did not create an unlawful delay in the submission of the application for a search warrant, as no officer testified that he would have altered the course

- 18 -

of the investigation had Appellant been out of custody. Trial Court Opinion, filed March 12, 2015, at 19-20. Moreover, Officer Smith testified that prior to the time he prepared the application for the search warrant for Appellant's residence, Officer Gansky had informed him he had spoken with the person who had exited the home with Appellant in the Fairmont section of Philadelphia, Jason Mellor. N.T., 8/21/13, at 70-72. Mr. Mellor advised Officer Gansky he had just purchased several pounds of marijuana from Mr. Young which Mr. Young carried into the residence in a black duffel bag. *Id*. at 76. This information, included in the affidavit of probable cause, was not dependent upon items seized following the traffic stop.

Appellant next avers that as he was in police custody during the time Corporal Kolman and Officer Cowden entered his home and they had no information that anyone else resided there, they cannot reasonably contend they believed items therein were at risk of being destroyed or removed from the residence; thus, the trial court erred in concluding the officers' warrantless entry for purposes of securing the premises while they awaited a search warrant was justified by exigent circumstances. Brief for Appellant at 31-32. In analyzing this issue, we are mindful of the following:

> It is well established that "probable cause alone will not support a warrantless search or arrest in a residence ... unless some exception to the warrant requirement is also present.... [A]bsent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists." [ ... ] [O]ur Supreme Court explained that "[i]n determining whether exigent circumstances exist, a number of

factors are to be considered," such as, (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or danger to police or other persons inside or outside the dwelling. Nevertheless, police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

*Commonwealth v. Bowmaster*, 101 A.3d 789, 793 (Pa.Super. 2014) (citations omitted).

Herein, the trial court determined exigent circumstances permitted investigating officers to enter Appellant's home prior to obtaining a warrant. The trial court recognized that officers had no reason to believe Appellant, who was in custody, posed a danger to them or that anyone knew he had been arrested which may prompt him or her to attempt to destroy or conceal evidence located in his residence. Notwithstanding, the trial court reasoned that the home's geographical location along the Neshaminy Creek posed a safety concern in that it was impossible for officers to secure the residence from the perimeter and further observed that prior to their entry, officers noticed a light on in the home and viewed numerous vehicles parked in Appellant's cul-de-sac. The court also stressed that officers also had

probable cause to believe Appellant had committed a felony drug delivery offense the prior week, that he was suspected of possessing narcotics and paraphernalia on the night in question, and that they entered his home peaceably and solely to secure their safety. Trial Court Opinion, filed March 12, 2015, at 21-22. In the alternative, the trial court opined that even were this Court to determine exigent circumstances did not exist to justify officers' initial warrantless entry and protective sweep of Appellant's residence, the independent source exception to the exclusionary rule applies herein. *Id*. at 22 (citing *Commonwealth v. Beck*, 34 A.3d 111 (Pa.Super. 2011).[4]

Upon our review of the record, under the specific facts of this case, we find the Commonwealth failed to establish that exigent circumstances existed for Corporal Kolman and Officer Cowden to enter Appellant's home while they awaited the issuance of a search warrant. With only their observations that the home was adjacent to a creek, a single light was on inside, and vehicles were parked in his cul-de-sac, officers simply did not have probable cause to believe Appellant, who was in their custody, was armed or that criminal activity was afoot inside or outside of the dwelling. Indeed, Officer Smith testified that generally it is possible for officers to secure a home by simply standing at the front and back entrances thereto, and admitted that they could have surveilled Appellant's home without

_____

[4] In light of our discussion, *infra*, we need not engage in an independent source rule analysis herein.

- 21 -

needing to stand in the Neshaminy Creek because a small deck/patio was attached to the rear of the home. N.T., 8/21/13, at 90. In addition, as is indicated in the aforementioned statement of the relevant facts, Corporal Kolman and Officer Cowden indicated they saw no movement when they canvassed the area around the home, and when they entered and announced themselves they saw nothing and heard no movement aside from a dog secured in a cage. Though parked vehicles were in the vicinity, the officers were unsure whether any of those vehicles belonged to individuals present inside the home. As such, while the officers stressed they had probable cause to believe Appellant was dealing narcotics and peacefully entered the home prior to obtaining a warrant in an effort to ensure that any potential evidence would not be concealed or destroyed, under the facts herein, their concerns do not outweigh Appellant's individual rights and liberties. *See Bowmaster, supra*.

However, even if the officers' initial entry into Appellant's residence were not justified by exigent circumstances, such unlawful entry does not mandate the suppression of the evidence they recovered later pursuant to a valid search, for our Supreme Court has determined that where some evidence listed in a search warrant affidavit had been unlawfully obtained, we must nevertheless consider whether the affidavit otherwise sets forth probable cause in the absence of such evidence. *Commonwealth v. Hernandez*, 935 A.2d 1275 (Pa. 2007). "In other words, we must decide

whether, absent the information obtained through illegal activity, probable cause existed to issue the warrant. . . . Only evidence that was available to police because of the unconstitutional search, *i.e.*, the product of the illegal police activity, is disregarded." ***Id***. at 1283-1284 (citations omitted). Our review of the record leads us to conclude that the untainted, legally obtained information contained within the search warrant affidavit was sufficient to establish probable cause to search Appellant's residence.

As the Commonwealth acknowledges, the Magisterial District Judge who reviewed the warrant application had been informed of the initial observations of officers securing the residence and, undoubtedly, they were in communication with members of the special investigations unit as they secured the home. Also, a single line on the last page of the six-page search warrant application indicates that "[w]hile securing [Appellant's] residence [Corporal] Kolman and Officer Cowden observed the following items in plain view in [Appellant's] residence: a bulletproof vest, a rifle, and empty [Z]iplock bags (identical to the ones recovered in [Appellant's] truck), and a large safe." However, the decision to prepare an application for a search warrant for Appellant's residence had been made prior to the time at which Corporal Kolman and Officer Cowden secured his residence to prevent the destruction or concealment of any evidence until such warrant was issued.

On November 26, 2012, officers observed Appellant leave his home carrying a large duffel bag, meet with the C.I. and provide him or her with

- 23 -

marijuana in exchange for currency. On December 3, 2012, officers followed Appellant to 30th Street in Philadelphia, watched him take a large duffel bag from his truck, carry it into and out of the residence, and were informed later that evening by an occupant of the home that Appellant sells him marijuana. Thereafter, officers discovered a significant amount of money and marijuana in the individuals' room in the home. While these incidents were separated by seven days, a lapse of time between officers' discovery of criminal activity and the issuance of a search warrant will not necessarily dissipate probable cause or be deemed too remote where it is shown that criminal activity is likely to have continued up to the time of the issuance of a search warrant. *Commonwealth v. Haggerty*, 564 A.2d 1269, 1272 (Pa.Super. 1989).

After setting forth their employment and qualifications, the affiants, Officers Smith and Brady detailed the following:

> Whereas, within the last ten days your affiants spoke with a confidential information (C.I. 12-72) in reference to someone they knew was selling marijuana. The informant advised your affiants that he/she would be able to purchase marijuana from a male named Brett. The informant advised your affiants that Brett lives in the Bensalem area. Your affiants were able to determine that Brett, was Brett Young, of 5445 Flushing Rd. The informant also advised your affiants that Brett drives a dark colored pickup. The informant also advised your affiants that he/she had purchased marijuana out of Young's residence in the past.
>
> Whereas, on 11/26/12 your affiants conducted a controlled buy utilizing (C.I.12-72). On that date the informant was issued pre recorded buy money for the buy. He/she and their vehicle were searched prior to the buy and found void of contraband. Prior to

the buy Sgt. Bugsch and Officer Gansky were conducting surveillance at Young's residence at 5445 Flushing Rd Bensalem. At approximately 1900 hours Sgt. Bugsch observed Young leave his residence carrying a dark bag. (Young was driving his 2007 black Lincoln pick-up bearing PA registration YWS-1613. The tag was run through NCIC and came back to Brett Young of 5445 Flushing Rd). Young was then followed to a pre arranged meeting location where he sold the informant marijuana. After the deal was [sic] the informant turned over the marijuana to Officer Gansky. Young was then followed back to his residence at 5445 Flushing Rd Bensalem PA.

Whereas, C.I. 12-72 has no crimi falsi arrests or convictions. C.I. 12-72 has been deemed reliable based on cooperation with the Bensalem Police Special Investigations Unit that has proven to be accurate, truthful and reliable. The confidential [i]nformant has supplied Affiant Smith with information regarding drug usage and trafficking. The confidential informant never supplied any information to Affiant Smith that turned out to be inaccurate, untruthful or unreliable.

Whereas, on 12/3/12 your affiants were conducting surveillance on Young. Young left his residence at approximately 1845 hours and followed into Philadelphia. Young was followed to the area of 30th and Cambridge St. in Philadelphia. Officer Gansky observed Young retrieve a large black duffel bag from the rear of his pick up bed. Officer Gansky stated that the bag appeared to be very heavy. Young then carried that bag into 918 30th Street Philadelphia PA. Young was inside for approximately 20 minutes before exiting. Young was observed carrying a large black duffle [sic] bag out of that residence. Young was then followed from 918 30th Street Philadelphia PA. Young was then initiated in a traffic stop on Bristol Pike Bensalem PA by Officer Cowden.

Whereas, Officer Cowden initiated Young's vehicle in a traffic stop for tinted windows and the previous described activity. Officer Cowden observed that Young appeared to be nervous. Officer Cowden stated that Young would not make eye contact with him. Officer Cowden stated that Young's hands were shaky when handing him his registration. Officer Cowden asked Young where he was coming from? Young stated that he was at a friend's house in the city. Officer Cowden also asked Young where he was headed. Young stated that he was headed home to Flushing Rd. After speaking [to] Young Officer Cowden asked

> Young for consent to search his vehicle. Young replied, "No, do you have a search warrant[?]" . . . .

Affidavit of Probable Cause, 12/4/12, at ¶¶ 4-8.

This untainted information is distinguishable from the subsequently tainted evidence obtained following the traffic stop and from the brief reference to the items officers saw upon their warrantless entry into Appellant's residence. Indeed, Corporal Kolman and Officer Cowden entered Appellant's home not with an eye toward gaining additional information for use in the preparation of the affidavit of probable cause, but rather to secure it. Their entry was not forcible, and they made only cursory observations of items in plain view as they sought to ensure no other occupants were present; no evidence was seized until the search warrant was executed. **See Commonwealth v. Bruner**, 564 A.2d 1277, 1282 (Pa.Super. 1989) (observing that officers' warrantless entry of premises did not result in a search, seizure or observation of evidence or result in a modification in the already executed search warrant). Moreover, their warrantless entry was not the source of any significant substantive changes to the affidavit. Accordingly, an analysis of the four corners of the affidavit reveals that it set forth sufficient probable cause independent of any tainted evidence to support the warrant; therefore, the warrant was valid and the evidence seized under its authority was properly admitted at trial. **See Herndndez**, **supra**.

To the extent Appellant challenges the nighttime aspect of the issuance of search warrant, we find this issue to be waived. At the suppression hearing, Appellant argued simply that the entry into his home prior to the issuance of a search warrant "violated not only the knock and announce rule, but also that there were no exigent circumstances justifying the entry into the home without probable cause with the search warrant." N.T, 8/21/13, at 6-7. Appellate review of an order denying suppression is limited to an examination of the precise basis under which suppression initially was sought, and no new theories of relief may be considered on appeal. *Commonwealth v. Little*, 903 A.2d 1269, 1272-73 (Pa.Super. 2006). Appellant did not develop a specific argument regarding nighttime execution of the warrant in his motion to suppress argued at the suppression hearing or in his post sentence motion. Thus, it is waived. *See Commonwealth v. Gordon*, 528 A.2d 631, 642 (Pa.Super. 1987) ("The raising of one particular theory in support of a suppression claim is not sufficient to preserve all other possible grounds for suppression of the same evidence").[5]

_____

[5] We are mindful that our Supreme Court has mandated "(n)o search warrant shall authorize a nighttime search unless the affidavits show reasonable cause for such nighttime search." Pa.R.Crim.P. 203(E). Due to the greater intrusion upon an individual's privacy occasioned by a nighttime search, some greater justification than that required for a daytime search must be shown. *See* Pa.R.Crim.P. [203(E) and Comment]. Put simply, the

*(Footnote Continued Next Page)*

For all of the foregoing reasons, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/1/2016

---

*(Footnote Continued)* ———————

affidavit for a warrant authorizing a nighttime search must show both probable cause and some reason why the search cannot wait until morning*.*

**Bowmaster**, **supra**, 101 A.3d at 793-94 (italics and citations omitted). Herein, Officers specifically requested a nighttime clause be granted for the following reasons:

1. The residence is already secured by law enforcement.
2. To avoid the destruction of evidence.
3. [Appellant] is presently in custody and cannot be arraigned until the search of the residence is executed.
4. There are no occupants inside of the residence, therefore, no occupants will be disturbed while the search is being conducted during the evening hours.

Affidavit of Probable Cause, 12/4/12, at 5.